And now we will move to our final argument of the day. That's in in re Facebook, IPO, and so, Mr. Hayes, are you on the line? Good afternoon, Your Honor. Let me just, I hear you, but I don't see you. Say that again, speak again. There you are, Mr. Hayes, okay. Yeah, you fixed, that's perfect. That's good, I can see you now. All right, good afternoon. And then we have Mr. Rizzio-Hamilton. Yes, Your Honor, good afternoon. Am I saying that right, Rizzio? Rizzio, that's correct, Rizzio-Hamilton. Okay, and Mr. Duggan. Good afternoon, Your Honor. Okay, good afternoon. All right, so, Mr. Hayes, you have five minutes now and then a minute of rebuttal. So the floor is yours. Yes, thank you, Your Honor. I'm James Hayes. I'm the objector to the Facebook Security Settlement. On May 17th, 2012, Facebook and its selling shareholders sold more than 421 million shares of Common Ace stock, and the lead underwriter sold another 63 million shares, short at $38 per share. After the announcement, a fund manager at Capital Research told Morgan Stanley the price was ridiculous and canceled some orders. Before exchange trading began on May 18th, many institutions followed, and the IPO became undersubscribed, a fact known by the institutional purchasers, including the lead plaintiffs, but not the retail purchasers. Facebook stock closed at $38.23 on the first day of exchange trading, but opened at $36.53 on the second, after Morgan Stanley and the lead underwriters declined to support their $38 offering price in pre-market trading. We know this because Morgan Stanley and the lead underwriters made a reported $125 million profit by covering much of their green shoe short sale after Facebook shares fell substantially below the IPO price. The lead plaintiffs and main plaintiffs filed a consolidated action complaint in February 2013. The institutional lead plaintiffs alleged violations of the Securities Act that Facebook's offering documents were materially untrue and misleading. The complaint did not allege Exchange Act violations against Morgan Stanley and the lead underwriters, including the Section 20A Exchange Act violation alleged in the two Exchange Act actions. Most surprisingly, there were no fraud allegations against Morgan Stanley for violations of Section 10 of the Exchange Act. Exchange trading on May 18, 2012, was delayed because Morgan Stanley was reportedly having trouble executing changing orders. After the delay, Facebook stock opened at $42.05 per share, following what should have been a market-clearing trade of 82 million shares, but wasn't, as millions of shares with market sell orders had no buyers at $42. Consequently, the $42 price was artificial and fraudulent. The market price dropped toward $38 when the infield market sell orders replaced hours after the opening trade. Facebook closed at $38.23 per share. The lead plaintiffs, their counsels, and co-counsels, the institutional class and the retail class, their counsels and co-counsels, are demonstrably conflicted. First, the lead plaintiffs' counsels and named plaintiffs' counsels, also co-counsel with the lead plaintiffs' counsels, are conflicted in the concurrent representation of clients with divergent and conflicting interests. The institutional lead plaintiffs and the institutional class can only benefit from Facebook's Securities Act violations, while the named plaintiffs and the retail class also benefit from the Exchange Act violations by Morgan Stanley and the lead underwriters. Second, and more germane to the settlement approval, are conflicts between the institutional class and the retail class in the securities action. The institutional purchasers, including the lead plaintiffs, had access to research by the underwriter security analysts that were not available to the retail purchasers. Nine days before the IPO, Facebook's defendant, CFO, told lead Morgan Stanley banker that Facebook was no longer confident that it would meet its internal revenue estimates. Thus, on May 8, 2012, Facebook's treasurer, in an email to the finance department, said that she and the Morgan Stanley bankers immediately needed to see the Q2 to Q4 by-quarter revenue estimates from analysts for whom we have detailed models. The same day, the lead Morgan Stanley banker advised the defendant, CFO, that Facebook should immediately provide its new revenue figures to the syndicate analysts. Well, Mr. Hayes, let me just interrupt for a minute. I mean, these are the allegations that sort of were focused on in the complaint, and then there was a settlement, right? So the case settled as a class action. You're saying that the settlement isn't fair. What about the settlement isn't fair? Okay. The upshot is the institutional lead plaintiffs knew of the lead underwriters and syndicate analysts' updated revenue estimates before the IPO, and therefore, lack the standing to make Securities Act claims. Thus, class counsel's allocation of any settlement funds to the institutional class demonstrates the inadequate representation of the retail class that began with the lead plaintiffs dropping the Exchange Act claims against Morgan Stanley and the underwriters. I conclude the court should overturn the settlement approval and remand the consolidated action to the district court to consider Exchange Act actions filed by the appellant and other plaintiffs in the consolidated actions on behalf of Facebook stockholders and to close the treaty on May 18, 2012. All right. Thank you. You've got a minute of rebuttal, but we'll now hear from who's first up, Mr. Rizzio-Hamilton. Thank you, Your Honor. John Rizzio-Hamilton from Bernstein, Litowitz, Berger & Grossman. I represent the plaintiffs' appellees. I'll present the main argument on behalf of all the appellees. Counsel for the underwriter defendants has a minute of time as well. Mr. Hayes, in this objection, has asserted two central contentions. The first is that the district court abused its discretion in approving the settlement because the plaintiffs did not assert a Section 10b Exchange Act claim against lead underwriter Morgan Stanley. The second is that the district court abused its discretion in approving the settlement to the extent that the release approved encompassed that claim. As to his first contention, there was no abuse of authority. The lead plaintiffs here were empowered to control the litigation as a whole and therefore had the authority to determine which claims to assert or not on behalf of the class. The second is that they exercised that authority reasonably. Asserting the Exchange Act claim against Morgan Stanley that's at the heart of Mr. Hayes' objection here would have for instance, it would have required us to prove reliance which would in turn have required us to prove market efficiency and the law in this circuit is well established that the market for a security immediately after an IPO is not efficient. In addition, asserting the 10b claim would have required us to prove loss causation unlike the Section 11 claims that we asserted. That would have been challenging here because defendants had a significant causation defense based on the system-wide failures experienced on the NASDAQ exchange on the first day of trading after the IPO. In addition, asserting the Section 10b claim would have required us to prove scienter which as the court knows is not an element of our Section 11 claim. Doing so would have been challenging here because we would have had to prove the scienter of an underwriter in connection with an offering which is no small task. So we made the decision not to assert the claim for those reasons right up front and then we took very extensive discovery and that discovery confirmed our decision not to assert the claim because it was not substantiated. We deposed four Morgan Stanley witnesses including the CEO and chairman of Morgan Stanley as well as the key witness Mr. Hayes identifies in his reply papers, Mr. Michael Grimes who is the lead investment banker on the IPO. We deposed 13 underwriter witnesses overall. We took a total of 37 fact and expert decision depositions. We reviewed 1.5 million pages of documents, completed fact and expert discovery, and summary judgment briefing and ultimately settled the case weeks before trial. Much of that discovery which is the greatest amount of discovery I actually have ever seen taken of underwriter defendants in connection with an IPO case focused on the very issues at the center of Mr. Hayes's proffered Section 10b claim including the pricing issues, the allocation issues, and the oversubscription issues. We analyzed it and it demonstrated that the claim he wanted us to assert was not substantiated. Third, there was no prejudice to Mr. Hayes or any member of the class in not asserting this claim. Mr. Hayes and the class were on notice that we had decided not to do this as early as 2013. He was repeatedly informed that we had decided not to do this as early as 2010-2016. He elected not to assert it himself even though he had every opportunity to and ultimately we disseminated 1.3 million settlement notices in this case and received only two objections which I think speaks volumes about whether the class believes it was prejudiced by the absence of this one particular claim against one particular defendant. With respect to his second contention, namely the scope of the re-release that fails to show an abuse of discretion for two reasons. First, the release comports with the identical factual predicate doctrine set forth in this court's Walmart decision and second, because neither Mr. Hayes nor any other class member has actually asserted the 10b claim at the core of his objection, really what he's asking for is an advisory opinion on the scope of the release as there is no actual concrete dispute implicating the release before this court. That really sums up my presentation. The district court vetted all his adequacy and conflict arguments very thoroughly in connection with final approval as well as earlier at the class certification stage found that they were without merit and Mr. Hayes has not proffered any reason why those for me. My time is concluded. All right. Almost exactly. We timed it just perfectly. All right. Mr. Duggan, you've got a minute. Let's see if you can be as economical. Thank you, your honor. I can perhaps be even more economical than that. Charles Duggan, Davis Polk, and Wardwell representing the underwriter defendant appellees. I'm obviously not going to repeat what Mr. Vizio-Hamilton has argued. I do want to emphasize one point which he touched on, however. It's a discrete point. In Mr. Hayes' reply brief, he states that the class council never took the deposition of the lead investment banker who advised Facebook in this transaction. That's simply an untrue statement and you can see the evidence that Mr. Grimes, the lead investment banker, was deposed on May 10, 2016 on page 327 of the special appendix. With that one point, I will conclude my argument. Thank you, your honor. Okay. Thank you. All right. Mr. Hayes, you have a minute of rebuttal. Anything you want to say in response to the arguments that you just heard? The argument that the lead plaintiff, the institutional lead plaintiff, has the ability to control the case and decide what claims are prosecuted and not disregards their conflict. The lead plaintiff, the institutional lead plaintiffs do not have an Exchange Act claim. Their claim is only a Securities Act claim because the Securities Act provides that the defendant is the issuer, which is Facebook. The district court consolidated a number of cases, including two Exchange Act classes, or two Exchange Act claims, and decided to put those Exchange Act claims with the Securities Act claims. But the district court did not intend for the lead plaintiffs to deconsolidate and leave those claims out of their consolidated complaint. I mean, the whole purpose of the consolidation was to have all the claims heard. And in this case, the Exchange Act claims were not heard because the conflicted counsel for the lead plaintiff and the lead plaintiffs didn't have any Exchange Act claims. And they just consolidated them out of the action. Well, that concludes the rebuttal. We will take this under advisement and reserve decision.